UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| RICKY LYNN COLE, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:09-CV-186-C |
| UNITED STATES OF AMERICA, | ) | (5:05-CR-027-01-C) |
| | ) | ECF |
| Respondent. | ) | |

**PROPOSED FINDINGS OF FACT AND RECOMMENDATION**

At issue is Petitioner Ricky Lynn Cole's 28 U.S.C. § 2255 motion to vacate, set aside, or correct a sentence by a person in federal custody.

**A.    Procedural History**

Cole was arrested, tried, and convicted of 107 counts of interstate transportation of child pornography, distribution of child obscenity, transportation of obscene matter, and aiding and abetting and was sentenced to 365 months in federal prison. He then filed a motion pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction on, among others, the ground that trial counsel provided ineffective assistance of counsel because he failed to object to alleged substantial government interference with defense witness Tina Cox-Cole (Cox). The district court denied Cole's motion and dismissed the cause; afterward, Cole appealed. The Fifth Circuit Court of Appeals granted Cole a certificate of appealability on the issue of whether the district court abused its discretion by denying—without conducting an evidentiary hearing—Cole's claim of ineffective assistance of counsel. Finding insufficient evidence in the record to evaluate the claim, the court of appeals vacated only with respect to that issue and remanded for further proceedings including an evidentiary hearing.

On September 12, 2013, the United States District Judge referred this matter to the undersigned for the limited purpose of conducting an evidentiary hearing and filing findings of fact and a recommendation. A hearing was held and both parties were represented by counsel. Based upon the testimony and evidence presented at the hearing, a review of court records related to this matter, and the applicable law, the undersigned submits findings of fact and a recommendation as set forth herein.

**B.      Summary of Testimony and Evidence**

Cole claims that both before and during trial, he expressed to his trial counsel the desire to call Cox as a material defense witness and to object to her failure to testify on the grounds of government interference. Cole claims that the FBI, and possibly other government officials, met with Cox and engaged in misconduct including intimidation and threats of prosecution, which dissuaded her from testifying. He maintains that had Cox testified, her testimony—regarding events surrounding the matters for which he was tried—would have resulted in his acquittal on all charges.

Although Cox was provided with an independent court-appointed attorney before making her decision not to testify, she claims that the interference was so substantial that her attorney would not have been able to convince her to testify. Cox filed two declarations regarding the alleged intimidation and her purported testimony. The first declaration—Petitioner's Exhibit 1, dated July 23, 2009—was filed with Cole's original § 2255 motion. The second declaration—Petitioner's Exhibit 2, dated November 5, 2012—was filed after Cole appealed the dismissal of his motion to the Fifth Circuit Court of Appeals.

**1.      Cox's Declarations**

In her declarations, Cox detailed her account of the events leading up to and surrounding her

decision not to testify at the trial. Cox lives in Fairbanks, Alaska. She states that she was first contacted by Special Agent Keith Quigley around April 20, 2005. He asked her about Cole's emails to her and told her that a local FBI agent in Fairbanks would contact her. Cox complains that Agent Quigley made a snide comment about Cox and Cole's upcoming wedding, said that he hoped she would not do anything stupid with the emails, asked her if she liked her job in a threatening tone, and made snickering noises.

Soon after, Special Agent Derik Stone of the Fairbanks FBI office contacted Cox and requested copies of the emails. Cox claims that she later saw Agent Stone at her house, and he attempted to open a door without her permission. She informed Agent Stone and another man with him that she had not finished copying the emails. Agent Stone gave her his card, and they left. She claims that he was polite and professional at that time but he was not when she went with a friend, Patricia Garris-Shoemaker (Garris), to give him the emails. Upon arrival at the parking lot Cox designated for the meeting, Garris asked Agent Stone for identification. Cox stated that Agent Stone laughed, refused to offer identification, and told Garris that she watched too much television. Cox then gave Agent Stone copies of the emails.

Cox married Cole on April 30, 2005, on top of Ester Dome summit near Fairbanks. After Cole's arrest on May 16, 2005, for bond violations, his daughters Darya and Jordan moved to Fairbanks to live with Cox, arriving on May 18, 2005. A little over a week later, Cox, Cox's daughter, Darya, Jordan, and Garris went up to Ester Dome to celebrate Cox and Cole's one-month wedding anniversary. While on the dome, Cox and Garris made a videotape of the scenery. Cox attests that she and Garris questioned Darya about her involvement in the crimes for which Cole was accused, and Darya admitted to being involved after the videotape was turned off. Garris then drove

Darya back to Cox's house.  Cox contends that the next day, Darya admitted to more details and that

a few days later, Darya came into Cox's room with some papers.  Cox states that she was on the

phone with Garris, and she laid down the phone without hanging up so that Garris could hear the

conversation.  She attests that her daughter and Jordan were also listening around the door.  Cox

claims that Darya handed her two letters—a confession letter and a suicide letter—and Cox read the

letters aloud.  *See* Gov't Ex. 2 (confession letter).

On June 23, 2005, Agent Stone interviewed Cox and Garris regarding Darya's actions.  *See*

Gov't Ex. 7 (interview notes).  The next day, Cox brought Agent Stone copies of the letters and

Garris brought a copy of the videotape.  *See* Gov't Exs. 8, 9.  Agent Stone copied the letters, but he

did not copy the videotape because it did not contain relevant information.  *Id.*  Darya subsequently

returned to Texas and moved in with her mother.  In September 2005, Agent Quigley learned from

Darya's mother that Cox had contacted Darya and Darya's employers—allegedly in a threatening

manner.  *See* Gov't Exs. 1, 11 (phone message and fax).  Agent Quigley once again contacted Agent

Stone and asked him to speak with Cox about her alleged harassment of Darya.

Cox wrote that Agent Stone came to her place of an employment, an elementary school, the

week before Cole's trial.  She claims that he was rude to the office staff and resistant to showing

identification.  During their meeting, he allegedly threatened her and said she "had ten seconds to

explain why he shouldn't haul [her] off to jail."  Pet'r's Ex. 1.  She claims she was told to "shut the

. . . up" over 30 times in a ten-minute period.  *Id.*  And she was told that if she "even breathed

[Darya's] name, they would charge [her] with witness tampering and obstruction of justice."  *Id.*

Cox claims that during the conversation Agent Stone pounded on the table with his handcuffs in

close proximity to her fingers and that the handcuffs would have broken her fingers if she had not

4

moved her hand.  Pet'r's Ex. 2.  She further claims that he said if she did not stop calling Darya, he was going to take her out in handcuffs in front of the school personnel, parents, and children.

In addition to the alleged threatening behavior by the agents, Cox claimed the government was involved in other intimidation tactics: she suspected her home phone was tapped because she heard clicking noises on the line; she observed a red laser beam shining through her bedroom window onto her headboard one night before trial; court documents and medication went missing from her home before she left for Texas, only to show up on her table after her return; and her daughter was consistently bumped from airline flights despite the apparent availability of seats, preventing the two from flying together.

Cox further attests that when her daughter arrived at the airport in Texas, two unidentified people approached, knowing her full name and flight information, but her daughter ran away from them.  Once the trial was underway, Cox states that she was told that she would be charged with witness tampering and obstruction of justice if she testified.  An attorney was appointed to represent her, and after consulting with the attorney she was afraid to testify.  She claims she had nightmares at the time and still feels traumatized by Agent Stone's actions.  In sum, Cox cites threats from the FBI agents, threats from the prosecution, and her daughter's alleged near-abduction at the airport as actions that amounted to substantial government interference that prevented her from testifying.

## 2.    Cole's Testimony

At the hearing before the undersigned, Cole, Agent Quigley, Agent Stone, and Cole's trial counsel (Counsel) testified to the circumstances surrounding Cole's and Cox's allegations.  Cole testified that: if she were present, Cox's testimony would be the same as her declarations; he had no influence over what she wrote; and her declarations included the same facts that she vocalized to

5

him before trial.  When he talked to Cox after Agent Stone's visit, she was upset and she felt like

Agent Stone was threatening her job.  Both Cole and Cox spoke with Counsel about the

government's alleged intimidation.  According to his recollection, Cox met with Counsel the

morning of the first day of the trial.  Cole testified that Cox had several times expressed her interest

in testifying.  During the trial, Cox was called to the stand.  Cole testified that he believed District

Judge Sam R. Cummings called Cox to the stand solely to admonish her; however, Counsel testified

that he called Cox to the stand with the intent of having her testify.

During Cole's trial, the government presented its theory that Darya's confession was

manufactured by Cox, and Darya was coerced into writing the letter.  Before taking the stand, Judge

Cummings addressed Cox and informed her that if she testified, she would be subject to cross-

examination by the government's attorneys and that she had the right to consult with an attorney

before testifying.  Cox asked to speak with an attorney, and independent counsel was appointed.

Cole was not present when the attorney spoke with Cox, and Cox was not called to testify the

following day.  Cole was aware that Cox would have been cross-examined and that her testimony

could either have helped or hurt his case, but he maintains that she should have been free to testify

of her own volition.  He testified that Cox would have been a valuable witness at trial, and he had

no reason—other than the alleged intimidation—to believe that she would not want to testify.

### 3.     Special Agent Quigley's Testimony

Special Agent Quigley, the lead case agent for the government, testified that his first contact

with Cox occurred when he learned of Cole's and Cox's email communications.  He called Cox,

discussed her email contact with Cole, and told her that he would arrange to have a local agent

contact her in order to retrieve the emails.  He testified that his only contact with Cox was over the

telephone, and, contrary to Cox's assertions, the conversations were cordial and limited to information gathering.

Agent Quigley's next contact with Cox arose when Darya's mother, with whom Darya lived after leaving Alaska, contacted him and voiced concerns that Cox was threatening Darya. Darya's mother provided Agent Quigley with a recording of a voice message that Cox left on her answering machine. In the message, Cox tells Darya to come forward with the truth, declares the need to protect children from child molesters like her, and lists several pieces of information Cox allegedly uncovered. *See* Gov't Ex. 1 (recording). Darya's mother also informed Agent Quigley that (1) an anonymous female had contacted the manager at the Wal-Mart where Darya worked and (2) a letter, which stated that Darya had a poor employment record and "has many attributes that are indicative of a pedophile," was sent to a restaurant where Darya applied to work. *See* Gov't Ex. 11 (letter). The letter instructs the restaurant to contact Cox for further information. *Id.*

In response to the information provided by Darya's mother, Agent Quigley spoke with the prosecuting attorney and arranged for Agent Stone to meet with Cox and warn her about the possible consequences of continuing to contact Darya. Agent Quigley told Agent Stone to warn Cox that witness harassment was a criminal offense, but he left the details of how to handle the situation up to Agent Stone.

**4.      Special Agent Stone's Testimony**

At the hearing, Agent Stone testified that after receiving the initial call from Agent Quigley, he contacted Cox to request the emails. *See* Gov't Ex. 4. Cox stated that she would not speak with him unless she had a witness and the interview was audio recorded. Agent Stone advised Cox that it was against FBI policy at that time to audio record interviews and that all he needed was the

emails. *Id.* He testified that at no time did he try to break into her house, but that he may have visited, found that no one was home, and left his business card—as was his usual practice. Later he met Cox, accompanied by Garris, in order to retrieve the emails. Because he does not have a badge number, he testified that he may have told Garris that she had been watching too much television. A handwritten note on the documents listed his name as "Derik Stone." *See* Gov't Ex. 5. Because people often spell his name wrong, this lead him to believe that Cox already had his business card.

Agent Stone's next involvement with Cox occurred when she contacted him about the videotape and Darya's letters. Agent Stone interviewed Cox and Garris on June 23, 2005. *See* Gov't Ex. 7. He testified that the meeting was not confrontational, and he simply recorded the information provided. The next day, Garris brought in the videotape and Cox brought in the two handwritten letters. *See* Gov't Exs. 8, 9. He copied the letters and sent them to Agent Quigley.

After Agent Quigley contacted him about Cox's communication with Darya, Agent Stone visited Cox's place of employment. Cox claims the visit occurred on September 28, 2005, a week before Cole's trial. Agent Stone testified that he did not recall the exact date and that he did not document the interaction because the conversation was short and he was not seeking to collect evidence. He checked in and asked to speak with Cox in private. He testified that, contrary to Cox's allegations, he was not rude to the staff or resistant to showing identification. Agent Stone and Cox went into an empty classroom where another female employee was present. He told Cox that Agent Quigley had called him about her contact with Darya—the voice message and the letter to the restaurant—and she needed to stop contacting and harassing Darya. Cox denied the harassment. Because Agent Stone felt like Cox was not grasping the seriousness of the situation, he stated that

he removed his handcuffs to emphasize that witness tampering is a crime, but he did not bang them or try to hit Cox's hand. He testified that although he was assertive and firm, he did not repeatedly yell obscenities or raise his voice to a level that could be overheard by other classrooms. He testified that outside of warning her of the possibility that she could face obstruction of justice charges if she continued to harass Darya, he neither threatened prosecution nor told Cox that if she even breathed Darya's name, she would be prosecuted.

In general, Agent Stone testified that he knew very little about the case, and his only two interactions with Cox were to pick up the emails and to warn her about the harassment. He testified that he never spoke with her about—and he may not even have been aware of—her plans to testify. In regard to Cox's other allegations, both agents denied any knowledge of a phone tap and testified to the complicated administrative and procedural process required to tap a phone. Neither agent had contact with travel agents or involvement in Cox's travel plans. Overall, both agents denied any attempt to interfere in any manner with witness testimony.

**5.     Trial Counsel's Testimony**

Finally, Cole's trial counsel testified to his recollection of the events and his trial strategy. He was appointed later in the case after Cole's first court-appointed attorney was removed. He gave the majority of his case files to Cox at the conclusion of the trial, and he relied on his memory to answer questions at the hearing. He testified that Cox was extremely involved in the case. She fully believed in Cole's innocence, and she was insistent regarding her theory that Darya committed the crimes. Counsel interviewed Darya and, after the meeting, he believed that Darya had been forced to write the confessions. He thought the jury would believe Darya and sympathize with her. He knew Cox's actions would come out through Darya's testimony. He testified that in light of the case

9

likely to be presented, he advised Cole to accept the Government's plea offer.

Counsel was aware that Cox and Cole were unhappy with the way that the government handled the case. He testified that Cox thought the government was conspiring to keep her from testifying; however, he did not believe that the government was involved in witness interference. He remembered Agent Quigley's contact with Cox being minimal, and he neither contemplated objecting to government interference, nor did he recall Cole asking him to object to government interference on Cox's behalf. He called Cox to the stand during trial with the intent of having her testify, but he was not surprised when Judge Cummings informed Cox of her rights. After Cox met with her appointed attorney, Counsel was informed that Cox chose to invoke the Fifth Amendment, and he could no longer compel her testimony. He further testified that he does not know what Cox and her attorney discussed, but he believed Cox made a wise decision in choosing not to testify.

## C.   Findings of Fact and Conclusions of Law

Based on the testimony and evidence presented at the hearing, the undersigned finds as follows:

## 1.   The government did not engage in substantial interference with respect to defense witness Tina Cox-Cole.

Under the Sixth Amendment, a criminal defendant has the right to present witnesses for his defense without fear that the government will retaliate against the witness. *United States v. Girod*, 646 F.3d 304, 310 (5th Cir. 2011). And the Fifth Amendment protects a defendant from improper governmental interference with his defense. *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002). By substantially interfering with a defense witness's choice to testify, the government may violate the defendant's due process rights. *Id.* In order to establish substantial interference, a defendant must show a causal connection between the government action and the witness's decision

10

not to testify.  *See United States v. Thompson*, 130 F.3d 676, 687 (5th Cir. 1997).

The testimony and the evidence do not support Cole's claim that the government substantially interfered with his right to present a defense under the Fifth or Sixth Amendments.  Nor does the record support Cox's allegations of intimidation and misconduct by the government.  The mere correlation between Agent Stone's visit with Cox in Alaska and her decision not to testify after her arrival in Texas is not enough.  *See Girod*,  646 F.3d at 312 (noting claimant must at a minimum prove causation).  Agent Stone did not tell Cox that she would be prosecuted if she testified.  According to his testimony, he could not even recall if he knew at the time that Cox was planning to testify.

Agent Stone testified that because Cox did not seem to understand the seriousness of the claims that she had engaged in witness harassment, he warned her that she could be prosecuted if she continued to harass Darya.  He testified that he only removed his handcuffs in order to emphasize the serious, criminal nature of witness tampering.  The law does not prevent the government from informing witnesses of the potential consequences of breaking the law. *Thompson*, 130 F.3d at 687; *see also Bieganowski*, 313 F.3d at 292 (finding no substantial interference when the prosecutor advised the defense witness that she could be prosecuted if she committed perjury on the stand).

Because the government believed Cox had engaged in witness tampering and had coerced Darya into writing the confession letters, the district court informed Cox of her constitutional right against self-incrimination and her right to consult with an attorney before testifying.  *See United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988) ("A prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct.").  The record reflects that Judge Cummings's

11

statements were for the purpose of ensuring that Cox had the opportunity to talk with independent

counsel about the decision to testify as well as the potential risks.  After consulting with her court-

appointed attorney, Cox chose not to testify.  Considering the circumstances, the evidence does not

establish substantial government inference with Cox's decision not to testify.

**2.      Cole's trial counsel did not provide ineffective assistance of counsel.**

Because the evidence does not establish substantial interference designed to prevent Cox

from testifying, Cole's trial counsel's failure to object to alleged interference did not amount to

ineffective assistance of counsel.  Counsel was aware of Cox's problems with the government and

her belief in a conspiracy; however, he testified that he did not believe that the government was

engaged in misconduct and he never contemplated objecting on grounds of witness interference.

Lacking any evidence or even a belief that the government was interfering with Cox's decision to

testify, Counsel had no reason to bring such a claim to the trial court's attention.  "Failure to raise

meritless objections is not ineffective layering; it is the very opposite." *Clark v. Collins*, 19 F.3d

959, 966 (5th Cir. 1994); *see also Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel

is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim.").

Significantly, Cole has not shown that Cox's testimony would have contained any new

material exculpatory evidence to aid in his defense.  *See Strickland v. Washington*, 466 U.S. 668,

694 (1984) (noting a "defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different").  Both

Garris and Darya's sister Jordan were called as witnesses and testified to the incidents described in

Cox's declarations, including Darya's admissions on Ester Dome.  The confession letters were

admitted into evidence and presented to the jury.  Counsel testified that Cox's testimony would not

have added anything more to the defense than what was already presented through Garris's and Jordan's testimony and the letters. *See Viera*, 839 F.2d at 1115 (finding no suggestion that the purported testimony would have contained any material exculpatory evidence to aid in the defense).

Although he did not believe Cox's testimony would have helped the defense, Cole's trial counsel testified that Cox was present, ready to testify, and he planned to call her to testify. Because he was aware that Cox's conduct would come out during Darya's testimony, he was not surprised when the government requested the district court to inform Cox of her rights. But only after he was informed by her attorney that she intended to invoke the Fifth Amendment privilege against self-incrimination did he refrain from calling her to the stand. In this regard, Cole's trial counsel employed reasoned legal strategy, and his actions did not deny Cole effective assistance of counsel.

### D.    Recommendation

Cole has failed to prove by a preponderance of the evidence that he was denied effective assistance of counsel. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The court must be guided by a strong presumption that trial counsel rendered adequate assistance and that counsel's decisions in regard to the challenged conduct was the product of reasoned trial strategy. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). Based on the testimony and evidence, the undersigned recommends that the district court find that counsel employed sound trial strategy and rendered adequate legal assistance in the criminal proceedings against Cole and that Cole's claim of ineffective assistance of counsel is without merit.

### E.    Right to Object

A copy of this Proposed Findings of Fact and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Proposed Findings of Fact

and Recommendation must file specific written objections within fourteen days after being served

with a copy.  28 U.S.C. § 636(b)(1) (2014); Fed. R. Civ. P. 72(b).  To be specific, an objection must

identify the specific finding or recommendation to which the objection is made, state the basis for

the objection, and specify the place in the Proposed Findings of Fact and Recommendation where

the disputed determination is found.  An objection that merely incorporates by reference or refers

to the briefing before the magistrate judge is not specific.  Failure to timely file specific written

objections will bar the aggrieved party from appealing the factual findings and legal conclusions of

the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain

error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

       Dated:       April 11, 2014.

NANCY M. KOENIG
United States Magistrate Judge

14